IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| YOUNG SANCHEZ,<br><br>    Plaintiff,<br><br>  vs.<br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br><br>    Defendant. | **MEMORANDUM DECISION & ORDER**<br><br>Case No: 2:09-CV-1116 DN<br><br><br>Magistrate Judge David Nuffer |

   Plaintiff Young Sanchez seeks judicial review of the Commissioner's decision denying her application for Social Security disability benefits and supplemental security income under Titles II and XVI of the Social Security Act.[1]  Sanchez alleges that she became unable to work at the age of fifty-eight, primarily due to mental problems.[2]  The case is before the magistrate judge by consent of the parties under 28 U.S.C. § 636(c).[3]  After a careful review of the entire record and the parties' submissions, the court concludes that the case should be remanded to the Commissioner for further proceedings.

---

[1] 42 U.S.C. §§ 401-434, and 1381-1383f, respectively.

[2] Tr. 90,  105.

[3] Docket no. 9, filed April 28, 2011.

## PROCEDURAL HISTORY

Sanchez applied for social security disability insurance benefits[4] and supplemental security income[5] with a protective filing date of March 26, 2003.[6]  Her applications were denied initially[7] and on reconsideration.[8]  Sanchez then obtained a hearing before an Administrative Law Judge (ALJ) which was held June 17, 2005.[9]  The ALJ concluded that Sanchez was not disabled because she was capable of performing her past relevant work.[10]  After the Appeals Council declined to review the ALJ's decision,[11] Sanchez filed suit in district court which resulted in a remand.[12]  After a second hearing on August 11, 2008,[13] Sanchez was again found not disabled because she could perform her past relevant work.[14]  The Appeals Council denied review[15] making the ALJ's decision the final decision of the Commissioner.

---

[4]Tr. 59-61.

[5]Tr.  293-96.

[6]Tr. 355.

[7]Tr. 30.

[8]Tr. 29; 32-34.

[9]A transcript of the hearing may be found in the administrative record at pages 298-338.

[10]Tr. 25.

[11]Tr. 4-6.

[12]See Tr. 445-50.

[13]A transcript of the second hearing appears at pages 382-429 of the administrative record.

[14]Tr. 369.

[15]Tr. 339-41.

## SUMMARY OF EVIDENCE

### A. Background

Sanchez  was born in Korea and has no formal education or training.[16]  In addition to her mental impairment, she also suffers from breathing and heart problems.[17]

### B. Administrative Hearing

At the first hearing held June 17, 2005, a Korean interpreter was present to provide assistance as needed.[18]  Sanchez testified that she was 61 years old and had no children.[19]  She stated that she does not drive a car because she is too scared.  She does not go outside very much.  She stated that she sometimes sees "wrong things".  For example, when she is sitting in the house watching TV, she sometimes has the impression that someone is passing her by.  But when she turns to look, no one is there.[20]

She had worked as a tester at EDO Corporation.  She stated that she had a problem for twenty-four years with co-workers and supervisors.  She never let it out because she needed to survive.  When she went home, she would cry it out.[21]  She stated that her job with EDO ended

---

[16]Tr. 110,301.

[17]Tr. 105, 397-98.

[18]Tr. 300.

[19]Tr. 304.

[20]Tr. 304.

[21]Tr. 305.

when she was evicted from her apartment and had to  live out of her car.  She became angry and had an argument with her boss.[22]

From 2000 to 2002, she worked for Harmon Music Store.  She was laid off when production was outsourced to China.[23]  She tried to find another job, but was unsuccessful.[24]  She stated that she would have been able to keep working if she had not been laid off.[25]

In 2003, she lived with a roommate.  She was able to prepare simple meals, and would walk to the grocery store to shop.[26]  She stated that she stayed in the house and was scared to go outside; she was traumatized.  She kept busy with household chores.  She might clean a little bit; then her mind would go blank and she would sit down and watch TV.  When her mind came back, she would wash clothes and things like that.  She also cared for five cats.[27]

In 2004, she was seeing a psychiatrist.  Someone would pick her up, take her to the psychiatrist, and take her back home.[28]  She could not get out of the house to go anywhere.[29]  She stated, however, that about once a week, she would walk to a tanning salon where she would

---

[22]Tr. 306.

[23]Tr. 307.

[24]Tr. 307-08.

[25]Tr. 307-08.

[26]Tr. 309.

[27]Tr. 310.

[28]Tr. 311.

[29]Tr. 312.

meditate.[30]  She stated that sometimes she cannot recall what happened yesterday.[31]  Sometimes she gets dizziness on her medication and her energy leaves her.[32]

The day before the hearing, she got up about seven o'clock and went for a walk.  When she returned home around eleven o'clock, she cleaned the house, washed some clothes, prepared some simple meals, and played with her cats.[33]  She went to bed about midnight.  She took a sleeping pill which causes her to not be able to walk very well, so she has to crawl.  When she lies down, she keeps hearing and seeing the "wrong things."  She told her doctor that she was afraid someone was trying to kill her, so that is why she takes the sleeping medication.  She stated that people hurt her so much.  She hates people, and she is scared to death.[34]

She testified that she would not be able to do her old job at Harmon's Music Store because lots of time she forgets, and because of anxiety.[35]  She took an anxiety pill before the hearing.  She stated that before suffering a coma, she could have worked at her jobs.  The coma changed everything including her personality.  She was different emotionally, experienced more anxiety, and had trouble with memory.[36]  She stated that she has conflicts with people.  If a boss criticized her work, she would get mad.  She also stated that she was sad because she is alone

---

[30]Tr. 313-15.

[31]Tr. 316.

[32]Tr. 318.

[33]Tr. 317-18.

[34]Tr. 319.

[35]Tr. 320.

[36]Tr. 321.

with no family.[37]  She stated that people put her down which makes her very angry.  Her medication controls her anxiety, but it does not always help.[38]

At the second hearing held August 11, 2008, Sanchez's husband testified that in October 2005, he took her to the hospital with heart problems.  She had surgery and received a stent.  He stated that she was in a coma for three days, and has not been the same person since.[39]  He stated that her phobias are worse; she will start to panic in a room with more than three people; she wants to jump out of the car if he drives more than fifty miles an hour; and she does not like walking over bridges.[40]  She has a lot of anxiety and will start shaking.  She has had a suicide attempt since the last hearing.[41]  He stated that her memory is not all there; she is scared to go out of the house; she does not walk like she used to; and gets winded easily.  She will not drive a car or take public transportation.  She does not socialize except for calling the pastor once in a while.[42]  She is able to focus only about a third as well as before.[43]  He stated that she has problems with both long- and short-term memory which causes her to get angry and frustrated.  If anyone is critical of her, she gets very angry and starts shaking.[44]

---

[37]Tr. 322-23.

[38]Tr. 323.

[39]Tr. 397-98.

[40]Tr. 400.

[41]Tr. 401.

[42]Tr. 402-03.

[43]Tr. 404.

[44]Tr. 405.

Sanchez again testified that people put her down and humiliate her, and she gets angry.[45] She stated that this interferes with her ability to work.[46]  She also testified that she was treated badly at the hospital, and she could hear people laughing at her.[47]

## C.  Other Evidence

The court will discuss the testimony of the Vocational Expert and portions of the medical evidence pertinent to the parties' arguments in the body of this decision.

DISCUSSION

## A. Legal Standard

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[48]  The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[49]

---

[45]Tr. 406-09.

[46]Tr. 409.

[47]Tr. 409-10.

[48]42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[49]42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

A person seeking social security benefits bears the burden of proving that because of his disability, he is unable to perform his prior work activity.[50]  Once the claimant establishes that he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy.[51]

The Commissioner's decision must be supported by substantial evidence.[52]  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[53]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[54]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review.[55]  In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its judgment for that of the agency.[56]  However, the court should carefully examine the record and review it in its entirety.[57]  Failure of the Commissioner to apply the correct legal standard is grounds for reversal.[58]

---

[50]*Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

[51]*Saleem v. Chater*, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975.

[52]*Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997).

[53]*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v NLRB*, 305 U.S. 197, 229 (1938)).

[54]*Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[55]42 U.S.C. §§ 405(g), 1383(c)(3); *Perales*, 402 U.S. at 390.

[56]*Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996).

[57]*Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

[58]*Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)    A person who is working is not disabled.  20 C.F.R. § 416.920(b).

(2)    A person who does not have an impairment or combination of impairments severe enough to limit his ability to do basic work activities is not disabled.  20 C.F.R. § 416.920(c).

(3)    A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1, is conclusively presumed to be disabled.  20 C.F.R. § 416.920(d).

(4)    A person who is able to perform work he has done in the past is not disabled.  20 C.F.R. § 416.920(e).

(5)    A person whose impairment precludes performance of past work is disabled unless the [Commissioner] demonstrates that the person can perform other work available in the national economy.  Factors to be considered are age, education, past work experience, and residual functional capacity.  20 C.F.R. § 416.920(f).[59]

## B.  The ALJ's Decision

The ALJ performed the sequential analysis, finding as follows:  (1) Sanchez has not engaged in substantial gainful activity since October 5, 2002, the alleged onset date;[60] (2) she has severe impairments including asthma, mild chronic obstructive pulmonary disease (COPD), anxiety-related disorders, and an affective disorder with psychotic features;[61] (3) she does not have an impairment or combination of impairments that meets or equals the listings;[62] and (4) she

---

[59]*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[60]Tr. 358.

[61]Tr. 358.

[62]Tr. 358.

is capable of performing her past relevant work as a production assembler.[63]  Based on these findings, the ALJ concluded that Sanchez was not disabled as defined by the Social Security Act.[64]

Sanchez raises three arguments in support of her disability claim:  (1) the ALJ improperly rejected the opinions of her treating and examining medical providers; (2) the ALJ improperly rejected her own testimony; and (3) the ALJ failed to conduct a proper assessment at step four of the sequential analysis.[65]

## C.  ALJ's Evaluation of Medical Opinions

Sanchez asserts that the ALJ committed legal error by failing to provide specific, legitimate reasons for rejecting the opinions of her treating and examining medical providers.[66] The court agrees.

Leslie Eckford, RN, LCSW, was one of Sanchez's medical providers at Valley Mental Health.  The parties refer to Ms. Eckford as "Nurse Eckford," so the court will do so as well. Nurse Eckford began treating Sanchez at the end of 2003 and saw her on a fairly regular basis through March 2005.[67]

On April 6, 2005, Nurse Eckford completed a Mental Residual Functional Capacity Assessment in which she found that Sanchez was "moderately limited" in four categories:  (1)

[63]Tr. 369.

[64]Tr. 369.

[65]Opening Brief at 11, docket no. 13, filed June 27, 2011.

[66]Opening Brief at 12-15.

[67]Tr. 236-68.

the ability to understand and remember detailed instructions, (2) the ability to carry out very short and simple instructions, (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (4) and the ability to ask simple questions or request assistance.[68]  In addition, Nurse Eckford found marked limitations in three categories:  (1) the ability to carry out detailed instructions, (2) the ability to accept instructions and respond appropriately to criticism from supervisors, and (3) the ability to travel in unfamiliar places or use public transportation.[69]

In response to questioning at the hearing by Sanchez's counsel, the Vocational Expert (VE) testified that a marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors would preclude all work.[70]  In his written decision, the ALJ stated that he accepted the medical findings and opinions of Sanchez's treating physicians as being supported by the objective medical evidence and the longitudinal record.  With regard to other medical providers including Nurse Eckford, the ALJ noted that they are not acceptable treating sources.  He stated, however, that those sources provided a "very good picture" of Sanchez's medical problems and prognosis based on the progress reports which "are supportive of one another."  He therefore "applied weight" to the medical findings of these other providers.[71] Further, the ALJ specifically discussed the Mental RFC assessment completed by Nurse Eckford

---

[68]Tr. 232-33.

[69]Tr. 232-33.

[70]Tr. 427.

[71]Tr. 368.

and her findings of moderate and marked limitations in certain areas as discussed above. The ALJ then stated that he accepted most of Nurse Eckford's findings except for her finding as to Sanchez's inability to complete a normal workday and workweek due to psychologically based symptoms, which the ALJ found was not supported by the record.[72]  The ALJ did not specifically reject Nurse Eckford's finding of a marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors which the VE testified would preclude all work.

The Commissioner makes two arguments in support of his determination on this issue. First, he states that the ALJ's decision is supported by substantial evidence in the record. Second, he argues that because Nurse Eckford was not an acceptable medical source, her opinion is not entitled to controlling weight.[73]  The court finds neither of these arguments availing.

In support of his argument that the ALJ's conclusions are supported by substantial evidence, the Commissioner has sifted through the record to find medical evidence that supports the ALJ's findings. However, the court may not rely on post hoc rationalizations that are not apparent from the ALJ's opinion.[74]  The court is only empowered to review the ALJ's decision for substantial evidence. It may not draw factual conclusions on behalf of the ALJ.[75]

---

[72]Tr. 365.

[73]Answer Brief at 12-18, docket no. 16, filed August 17, 2011.

[74]*Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004).

[75] *Allen*, 357 F.3d at 1144.

Although the Commissioner correctly states that Nurse Eckford is not an acceptable medical source, the ALJ was still required to consider her opinion as an "other source."  Due to the growth of managed health care and the increasing use of health care providers who are technically not "acceptable medical sources," the Agency promulgated Social Security Ruling 06-03p.[76]  Only "acceptable medical sources" such as licensed medical doctors may provide evidence to establish the existence of a medically determinable impairment, provide medical opinions, or be considered treating sources.[77]  However, the regulations also contemplate the use of information from "other sources," both medical and non-medical.[78]  The category of "other medical sources' includes, but is not limited to, "nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists."[79]  These sources may provide evidence concerning the severity of a claimant's impairments and how it affects her ability to work.[80]

Nurse Eckford's treatment notes indicate that she is a licensed clinical social worker as well as a registered nurse.  Based on her credentials, the court concludes that she qualifies as an "other medical source."  Indeed, SSR 06-03p lists licensed clinical social worker as an "other medical source."[81]

---

[76]*Frantz v. Astrue*, 509 F.3d 1299, 1301-02 (10th Cir. 2007); Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939, at *3 (Aug. 9, 2006).

[77]*Frantz*, 509 F.3d at 1301; see 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2), 404.1527(d).

[78]*Frantz*, 509 F.3d at 1301; see 20 C.F.R. §§ 404.1502, 404.1513(d).

[79]*Frantz*, 509 F.3d at 1301; 20 C.F.R. § 404.1513(d).

[80]*Frantz*, 509 F.3d at 1301; 20 C.F.R. §§ 404.1513(d)

[81]SSR 06-03p,2006 WL 2329939, at *2.

Under the facts of a particular case, the opinion of an "other medical source" can outweigh the opinion of an acceptable medical source, including a treating source.[82]   The Ruling states that these opinions "are important and should be evaluated on key issues such as impairment severity and functional effects."[83]   Under the regulations, the ALJ is required to consider the opinions of "other medical sources" and weigh them in the same manner that he weighs the opinions of acceptable medical sources.[84]   Importantly for this case, the Ruling instructs the adjudicator to explain the weight given to these opinions or otherwise ensure that the discussion of the evidence allows a claimant or subsequent reviewer "to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."[85]

As discussed, the ALJ stated that he accepted Nurse Eckford's findings except for her finding with regard to Sanchez's inability to complete a normal workday or workweek due to psychologically based symptoms which the ALJ found was not supported by the record.[86]   He also stated that he gave weight to Nurse Eckford's findings.[87]   However, the ALJ's finding that Sanchez could perform her past relevant work is in direct contradiction to the VE's testimony that another of Nurse Eckford's findings, a marked limitation in the ability to accept instructions

---

[82]*Frantz*, 509 F.3d at 1302; SSR 06-03p, 2006 WL 2329929, at *5.

[83]*Frantz*, 509 F.3d at 1302 (quoting SSR-06-3p, 2006 WL 2329939, at *3).

[84]*Frantz*, 509 F.3d at 1302; SSR 06-03p, 2006 WL 2329929, at *4.

[85]*Frantz*, 509 F.3d at 1302 (quoting SSR 06-p, 2006 WL 2329939, at *6).

[86]Tr. 365.

[87]Tr. 368.

and respond appropriately to criticism from supervisors, would preclude all work.[88]  Although the ALJ mentioned this finding,[89] he did not discuss it or give any explanation for rejecting it.  This was legal error.

"[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."[90]  Accordingly, the case should be remanded to allow the Commissioner to explain whether he rejected Nurse Eckford's findings, and if so, his reasons for doing so.

## D.  ALJ's Credibility Assessment

Sanchez asserts that the ALJ improperly rejected her subjective complaints.[91]  Generally, credibility determinations are the province of the ALJ and should not be disturbed if supported by substantial evidence.[92]  Nevertheless, the ALJ's findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[93]  In *Kepler v. Chater*, the Tenth Circuit held that the ALJ must give specific reasons for rejecting a claimant's

---

[88]Tr. 427.

[89]Tr. 365.

[90]*Frantz* 509 F.3d at 1302 (alteration in original)(quoting *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996)).

[91]Opening Brief at 15-17.

[92]*McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002); *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).

[93]*McGoffin*, 288 F.3d at 1254 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).

subjective allegations of pain and other symptoms.[94]  However, so long as the ALJ sets forth the specific evidence he relies on in assessing credibility, the requirements of *Kepler* are satisfied.[95]

In evaluating a claimant's subjective allegations of pain and other symptoms, the ALJ must determine (1) whether the claimant has established by objective medical evidence that she has a pain- or symptom-producing impairment; (2) whether there is a "loose nexus" between the impairment and the claimant's subjective allegations; and (3) if so whether considering all of the evidence, both objective and subjective, the claimant's alleged symptoms are in fact disabling.[96]

In this case, the ALJ followed the proper analysis finding that Sanchez's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but concluded that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.[97]

As the Commissioner points out, Sanchez's argument concerning the ALJ's credibility assessment is vague and fails to articulate any specific challenge to the ALJ's credibility findings.[98]  She does not cite any particular testimony that she feels was rejected by the ALJ or how it would bear on the disability determination.

---

[94]68 F.3d 387, 391 (10th Cir. 1995).

[95]*White*, 287 F.3d at 909.

[96]*Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004).

[97]Tr. 368.

[98]Defendant's Answer Brief at 18.

The ALJ thoroughly summarized the testimony of Sanchez and her husband,[99] as well as the medical evidence.[100]  He noted that much of her testimony was focused on her perception of how she was treated by other people.  It really did not support an inability to work although it did show that she needed to work in an environment with little exposure to the general public.[101]  The ALJ acknowledged that a coma episode experienced by Sanchez in November 2002 resulted in some cognitive and memory deficits and also exacerbated her mood problems and increased her focus on situational memories which made her more anxious.[102]  In the ALJ's opinion, however, subsequent medical reports showed Sanchez's mental problems continued to improve with treatment.  In support of this conclusion, the ALJ cited to the medical evidence of record.[103]  The court concludes that the ALJ provided adequate reasons for his credibility determination which is supported by substantial evidence in the record.  Accordingly, the court declines to disturb the ALJ's credibility determination.

**E.  Step-four Assessment**

Sanchez asserts that the ALJ failed to conduct a proper assessment at step four of the sequential analysis.  Step four of the evaluation process is comprised of three phases: (1) determination of the claimant's physical and mental residual functional capacity, (2) determination of the physical and mental demands of the claimant's past work, and

---

[99]Tr. 361.

[100]Tr. 362-67.

[101]Tr. 367.

[102]Tr. 363.

[103]Tr. 363-66.

(3) determination of whether the claimant has the ability to meet the job demands found in phase two despite the limitations found in phase one.  At each of the three phases, the ALJ is required to make specific findings.[104]

Plaintiff contends that the ALJ erred at each of the three phases.  She states that he erred at phase one by failing to include all of her limitations in the RFC assessment.   At phase two, he failed to identify the specific demands of her past work.  And at phase three, he failed to compare her limitations with the specific demands of her past work.[105]

The ALJ asked the VE at the second hearing to consider Sanchez's past relevant jobs. The VE classified her job at EDO Electronics as that of an electronics tester, which was light, semi-skilled work.[106]  He classified her job at Harmon Music as that of production assembler, any industry, which was light and unskilled.[107]

The ALJ provided the following RFC assessment in his hypothetical to the VE:

- The hypothetical person would have the ability to perform the full range of light and sedentary work, except that she would need a clean climate-controlled environment.

- The work would have to be at the lower stress level which has four elements:

    - Low to average production level.

    - Essentially no working with the general public.

---

[104]*Frantz*, 509 F.3d at 1303; *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996).

[105]Opening Brief at 17-18; Reply Brief at 6-7, docket no. 19, filed September 2, 2011.

[106]Tr. 420.

[107]Tr. 421-22.

- Only minimal contact with supervisors and co-workers on the job, but still having the ability to respond appropriately to supervision, co-workers, and work situations.

- Ability to deal with only minimal changes in a routine work setting.

- Language skills and abilities–the person speaks Korean. On the job she could understand and speak only a few simple words in English. So the job would have to be learned by demonstration with little communication in English required. It should be mostly repetitive assembly work.[108]

The VE responded that she would be able to do both of her past relevant jobs.[109]

The ALJ then changed the hypothetical to include only unskilled work at the lower concentration level and work at the lower memory level.[110]  The VE stated that she would still be able to do the production assembler job, but at reduced numbers in the national economy.[111]

Sanchez argues that the ALJ erred at phase one by failing to include all of her limitations in the hypothetical to the ALJ.[112]  This argument hinges on the ALJ's apparent rejection of some of the findings of Nurse Eckford. On remand, the ALJ should clarify whether he indeed rejected Nurse Eckford's findings. If so, he should explain the basis for the rejection. If he accepts her findings, he should adjust his RFC assessment accordingly.

Sanchez also argues that even if the ALJ's RFC findings are correct, the ALJ erred by accepting testimony from the VE that conflicts with the Dictionary of Occupational (DOT).

---

[108]Tr. 422.

[109]Tr. 423.

[110]Tr. 423.  The ALJ's RFC assessment found at tr. 359-60 reflects the second hypothetical.

[111]Tr. 423.

[112]Opening Brief at 18; Reply at 6-7.

When the ALJ relies on expert testimony to deny a claim, he must ask the VE whether his

testimony conflicts with the DOT and elicit a reasonable explanation of any discrepancy.[113]  In

this case, the ALJ did ask the VE whether there was a conflict, and the VE responded that there

was not.[114]

Sanchez argues, however, that there were a number of inconsistencies.  First, she notes

that the ALJ found that her work could not require more than simple words in English.  She

states that the DOT indicates that the job of electronics assembler is rated at Level 2 on the scale

of general educational development (GED).[115]  Level 2 language development appears to require

English language abilities significantly beyond the ability to speak and understand simple

English words as specified in the ALJ's RFC assessment.

The Commissioner responds that because the VE classified Sanchez's past relevant work

as that of production assembler, any industry, rather than electronics assembler, Sanchez's

argument regarding the conflict with the DOT on language skills is not germane.[116]  The court

agrees.  Further, as the Commissioner also points out, Sanchez had been able to perform her past

work for over twenty-six years despite her language limitations.[117]

Plaintiff states that contrary to the Commissioner's argument, the VE erroneously cited

the job as production assembler, any industry, but clearly had in mind the job of electronics

---

[113]*Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005).

[114]Tr. 427.

[115]Opening Brief at 18-20; Reply at 8-9.

[116]Answer Brief at at 24, note 11.

[117]Answer Brief at 24.

assembler.[118]   At the hearing, the ALJ pressed the VE to give an example of a job that Sanchez

would be capable of performing at a work site that the VE had visited in the last five years.

During this testimony, the VE talked about electronics jobs because electronics plants were the

only types of assembly plants that he had recently visited.  He stated, however, that electronics

assembly is a semi-skilled job, rather than unskilled.  Thus, he did not testify that Sanchez was

capable of performing the job of electronics assembler.  This VE's testimony concerning

electronics assembly appears to be a digression caused by the ALJ's insistence about naming a

particular job at a particular plant.  The VE clearly testified earlier that someone with the

limitations specified in the hypothetical could perform the job of production assembler, any

industry.

Pointing to the VE's comment about a job at Micron where workers would have to be

"very meticulous in their assembly and . . . "too many mistakes you're out the door,"[119] Sanchez

asserts that neither the production assembler nor electronics assembler meets her need for a low-

stress environment.[120]  However the ALJ did not find that Sanchez was capable of performing the

electronic assembly job.  Further, the ALJ specified in his hypothetical that the job should be low

stress which included a lower production rate.  In response, the VE testified that he had reduced

the number of jobs to reflect a lower production rate.  Accordingly, the court concludes that the

ALJ did not err at step four.

---

[118]Reply at 9.

[119]Tr. 424.

[120]Opening Brief at 20; Reply at 9-10.

**ORDER**

The ALJ erred by failing to explain his apparent rejection of the medical evidence

provided by Leslie Eckford, RN, LCSW.  Therefore, the case is **REMANDED** to the agency to

address this issue.

September 30, 2011.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge